UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

ANDREA HERRING,                         )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )          No. 2:15-CV-280
                                        )
SCI TENNESSEE FUNERAL                   )
SERVICES, LLC d/b/a EAST LAWN           )
MEMORIAL PARK AND EAST                  )
LAWN FUNERAL HOME,                      )
                                        )
          Defendant.                    )

## MEMORANDUM OPINION AND ORDER

Before the Court is the defendant's motion for new trial and remittitur, [Doc. 172]. In its

motion, the defendant requests (1) a new trial, and (2) remittitur of awarded damages. The plaintiff

has responded to the motion, [Doc. 180], and a reply has been filed, [Doc. 186]. Further, pursuant

to this Court's order, both parties have filed a brief concerning their position on the issue of

reinstatement, [Docs. 165 and 168]. These matters are ripe for disposition. For the reasons that

follow, the defendant's motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.        BACKGROUND

The plaintiff, Andrea Herring, brought this lawsuit against the defendant, SCI Tennessee

Funeral Services, LLC, ("SCI") seeking redress for violations of Title VII of the Civil Rights Act

for sexual harassment and retaliation. Herring was employed by SCI from November 2009 until

her termination on November 6, 2013. During her employment, a male coworker, Tim Stinnett,

frequently made unwelcome and inappropriate sexual comments to the plaintiff and engaged in

unwelcome sexual behavior towards her in the workplace. She brought concerns about her

coworker's behavior to SCI management and human resources. After she had raised her concerns to SCI, she was ultimately terminated.

Before trial, the defendant filed a motion in limine, [Doc. 59], to exclude certain witnesses, including the plaintiff's mother, Sheila Lively, for lack of personal knowledge of the events occurring at SCI. The Court ruled that these witnesses "could offer testimony as to the plaintiff's demeanor and how it was different when the alleged harassment was taking place," but that "they cannot state her treatment at work was the cause of an upset or anxious mood, or even that the events at work in fact took place." [Doc. 100]. The defendant did not object to the Court's ruling on this issue pre-trial.

This case was presented to a jury. At trial, the plaintiff called her mother to testify. During her mother's testimony, the defendant renewed its objection based on first-hand knowledge and added that statements made to the mother by others were hearsay. *See* [Doc. 182 at PageID # 1727]. After questioning from the Court, the defendant asserted in their oral objection that testimony by the mother of "how she observed [plaintiff's] feelings" would be admissible under the state of mind exception but "a description of what [the co-worker] allegedly said or didn't say would not be proper." [*Id*.] The Court overruled the defendant's hearsay objection and gave the jury a limiting instruction that "to the extent that this witness testifies about something her daughter told her that somebody else said, that evidence is being offered by the plaintiff only to shed light on the state of mind of the plaintiff at that time. You are not to consider the statements for the truth of the matters asserted." [*Id*.]

The jury ultimately returned a verdict in favor of the plaintiff on her sexual harassment and retaliation claims. The jury awarded the plaintiff $50,000 for emotional pain and mental anguish caused by the sexual harassment, $100,000 in back pay for the retaliation, and $150,000 for

emotional pain and mental anguish caused by the retaliation. The jury further awarded $1,750,000 in punitive damages, for a total net damages award of $2,050,000.

Before submission of the case to the jury, the Court asked the parties about their respective positions on the issue of reinstatement. At trial, both parties agreed that reinstatement would likely not be feasible; however, the defendant indicated that reinstatement at a facility in the Tri-Cities area may be possible. This Court decided to submit the front pay instruction to the jury, and "if there is an award of front pay, then [the Court] can take up the issue of whether or not the award of front pay is appropriate or whether reinstatement would be." [Doc. 183 at PageID # 1932]. The jury returned $0 for front pay. The plaintiff now requests reinstatement as a Family Service Counselor in the Chattanooga area. The defendant opposes any reinstatement.

## II. DISCUSSION

### A. Request for New Trial

The defendant's instant motion for a new trial is brought pursuant to Rule 59 of the Federal Rules of Civil Procedure. The defendant asserts that the jury's verdict is not reliable, but is instead the product of bias, prejudice, or speculation based on improperly admitted hearsay and causation evidence from the plaintiff's mother. Reliance on such improper evidence, the defendant argues, resulted in the jury reaching an erroneous verdict. The defendant further claims that the amount of damages and the ultimate verdict of liability is against the overwhelming weight of the evidence, and therefore a new trial should be granted.

#### 1. Legal Standard

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59. "A new trial

is appropriate when the jury reaches a 'seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias.'" *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013) (alteration in original) (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012)). A new trial *may* be granted if the trial court "improperly admitted evidence and a substantial right of a party has been affected." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989). Although the decision of whether to grant or deny a new trial is purely within the discretion of the court, "[e]ven if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence [or the exclusion of evidence] would have caused a different outcome at trial." *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir. 1998) (citing *Nida v. Plant Protection Ass'n Nat'l*, 7 F.3d 522, 527 (6th Cir. 1993)). The party seeking a new trial bears a "heavy burden" and must show that it "was prejudiced and that [the] failure to grant a new trial [would be] inconsistent with substantial justice." *Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1466 (6th Cir. 1993) (quoting *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987)). Ultimately, the governing principle for this Court's consideration of the defendant's motion for a new trial boils down to whether, in its judgment, "such course is required in order to prevent an injustice." *Park West Galleries, Inc. v. Hochman*, 692 F.3d 539, 544 (6th Cir. 2012).

### 2. Analysis

#### a. Verdict Against Clear Weight of Evidence

The defendant contends that the plaintiff did not offer any allegation of harassment which would be sufficiently severe or pervasive enough to constitute a hostile working environment. The

defendant points to the testimony of Charles Gibson, the human resources manager for SCI. In his testimony, he stated the plaintiff's reported allegations included Stinnett's comments to her about not being able to sit down because of a wild weekend, that Stinnett had pushed the bathroom door open while the plaintiff was occupying the bathroom, and that Stinnett had passed gas in her office and would not let her leave. The defendant stands by its theme of the case that, while these acts were unprofessional, they are not sufficiently severe or pervasive enough to constitute a hostile work environment.

The plaintiff responds that "the facts and arguments made by Defendant are so off base it is as though Defendant attended a completely different trial." [Doc. 180 at PageID # 1521]. In her response, the plaintiff recaps her own testimony at trial, in which she went into great detail about the harassment she experienced while working at SCI. Further, the plaintiff points to other behaviors of her coworker which she described at trial that the defendant's motion overlooks, including Stinnett's discussions about his sex life, his sexual comments and jokes, his inappropriate comments about her body parts, his sharing of photographs of his naked UT college sex partner, his invitations for the plaintiff to participate in sexual activity, running his foot along her behind near her private parts, his sending sexual text messages to her phone, and procuring a key to open the door to laugh at her while she was in the bathroom in just her bra and underwear.

Additionally, the plaintiff places focus on the testimony by witnesses from the defendant that the coworker's sexually harassing behaviors were corroborated at the time by another female coworker, Nikki Addison.[1] Indeed, both parties provided evidence at trial that SCI was aware of at least some of Stinnett's behavior, and the plaintiff's assertion that the harassment was based on her sex was largely unrebutted. Further, the plaintiff's evidence that SCI failed to take reasonable

---

[1] There was also testimony that Nikki Addison would avoid going to the restroom at all while Stinnett was working because of his behavior.

care in preventing or correcting the sexually harassing behavior was significant. The plaintiff showed that human resources conducted an interview into the corroborated allegations against Stinnett, but no formal action was ever taken against him. Further, they provided evidence that John Fredrickson, SCI market director, unreasonably told the plaintiff to air out her differences with local management rather than properly handling the matter or personally involving a human resources representative.

There is little question that the plaintiff presented sufficient evidence at trial for a reasonable jury to find severe and pervasive sexual harassment by the coworker. The plaintiff's testimony alone would have been sufficient to support the jury's finding, in which she recalled, in great detail, the sequence of sexually harassing events she experienced while working at SCI with the coworker, as well as her efforts to alert SCI of the behavior. However, the jury did not have to rely solely upon the plaintiff's testimony. Indeed, the defendant itself did not offer any testimony at trial directly denying the plaintiff's version of events. Rather, the defendant's own witnesses confirmed that many of the events that the plaintiff testified to actually occurred. The defendant presented evidence that SCI was notified of at least some of the accusations made by the plaintiff, and only offered evidence that she failed to report *all* of the inappropriate behavior and that her trial testimony was inconsistent with the information she provided to SCI at the time. The defendant did not offer the coworker as a witness to deny or even clarify the harassing behavior explained by the plaintiff in her testimony. And indeed, the emails sent by the plaintiff show direct evidence that she made formal complaints to alert SCI about her coworker's behavior. Overall, as to the sexual harassment claim, the verdict of the jury is not against the clear weight of the evidence.[2]

---

[2] The Court notes that even if the jury believed *only the defendant's own account* of the events, it would likely be reasonable to find that the coworker's behaviors constituted sufficiently severe or pervasive sexual harassment.

Regarding the retaliation claim, the defendant argues that the plaintiff did not sufficiently prove any causal connection between any protected activity and an adverse employment action; rather, the evidence showed that plaintiff was discharged because of her bad attitude and absenteeism.

The plaintiff responds with the overall "theme" of her case; that is, *before* reporting the sexual harassment, Herring had "a glowing performance record" and "was building an outstanding record in sales," whereas *after* reporting the sexual harassment, her employment picture "was dismal." [Doc. 180 at PageID # 1526]. Plaintiff points out that soon after reporting Stinnett's behavior, she began being criticized for absences under the subjective attendance policy; absences which were reported by Susie Mozolic, the location general manager, but were never further investigated by SCI human resources or upper management. Further, the plaintiff's own testimony suggested that Mozolic became upset, rude, and accusatory towards her after she had made the reports to SCI human resources manager Charles Gibson. Also, the defendant's own assertion that the plaintiff's final email to SCI requesting a transfer to a different position was the catalyst for her termination supports a causal connection between the protected activity and the retaliation. The plaintiff also points out that SCI's admitted untrue statements to the Equal Employment Opportunity Commission ("EEOC") in their responses to the plaintiff's EEOC charge render the testimony of SCI witnesses incredible.

Again, the jury's verdict on the retaliation claim was not against the clear weight of the evidence. Indeed, there was testimony that the plaintiff's personnel file did not contain a single write-up for attendance issues while employed at SCI. The defendant continues to assert that the plaintiff's attendance was least an important factor in her termination, yet even at the close of the evidence, there was no direct testimony from any witness clarifying which days the plaintiff had

actually missed prior to her termination. Indeed, SCI's own documents showed that plaintiff was terminated with remaining paid sick days left at the company.

The plaintiff's attendance chart prepared by SCI showed that she had taken multiple days off from work by using annual leave and sick days in the months prior to her termination; however, the defendant suggested that this chart potentially failed to be completely updated. Nevertheless, the defendant admitted that it provided no evidence that the plaintiff had missed days which were not approved by the company policy. Indeed, in arguing against the plaintiff's motion for a directed verdict, the defendant's position was that "even though these were approved sick days, complied with the policy, and they were within the days granted for vacation, that they still could fire her for excessive absenteeism." [Doc. 183 at PageID # 1908].

The plaintiff's testimony regarding Mozolic's behavior towards her after she complained about Tim Stinnett's behavior, if believed, could allow a reasonable jury to find retaliation.[3] Additionally, the time between the plaintiff's final email to SCI regarding the sexual harassment and her termination, coupled with the defendant's own admission that this email "was the final straw," could reasonably allow a jury to infer that SCI retaliated against her. As such, the verdict is not clearly against the weight of the evidence for the retaliation claim.

### b. Excessive Damages

The defendant further asserts that the jury's compensatory damages award of $200,000 bears no rational relationship to the evidence presented at trial. The defendant claims that "the only evidence presented by Plaintiff to support her mental anguish claim amount to nothing more than hurt feelings, anger, and frustration." [Doc. 173 at PageID # 1417]. It points out that the only

---

[3] The Court, and likely the jury, did not find Mozolic's testimony and denials to be particularly credible.

other testimony offered by the plaintiff on damages was Sheila Lively's testimony, which discussed the emotional state of mind of the plaintiff during the time.

Regarding damages awarded by a jury, "unless the award is (1) beyond the range supportable by proof [] (2) so excessive as to shock the conscience, or (3) the result of a mistake" the court must let the award stand. *Leila Hosp. and Health Center v. Xonics Medical Systems, Inc.*, 948 F.2d 271, 278 (6th Cir. 1991) (citations omitted). An award will not be excessive "if the verdict is within the range of proof and the jury was properly instructed." *Id.* (quoting *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 424 (6th Cir. 1984)).

In the present case, the plaintiff offered sufficient proof of damages which could support the jury's finding, the ultimate award does not shock the conscience, and it was not the result of a mistake. Therefore, the award is not excessive and should stand.

At trial, the plaintiff went into great detail regarding the emotional, psychological, and physical damage that she suffered from the sexual harassment and retaliation while working at SCI. She offered evidence that she worried every day about how she would be treated at work, that she was subjected to constant humiliation and pervasive sexual comments, and that she became sick, both physically and emotionally, from these events. She testified that she presented to a physician as a result of her sickness. She further testified that she was the breadwinner of her family, and that losing her job made it difficult to feed her children. She also testified that her family had to move to the Chattanooga area in search of employment as a result of her improper termination. She went into further detail regarding the timing of her improper termination, and the difficulties her family suffered as a result of being fired near the holiday season.

Sheila Lively also testified as to the plaintiff's state of mind during this time. She offered proof that the plaintiff became depressed during this time, and that she was still recovering from

that depression at the time of trial. Ms. Lively also testified that the plaintiff became physically ill and lost her livelihood and self-esteem.

A $200,000 award for emotional pain and mental anguish is within the range of proof offered at trial, does not shock the conscience, and is not the result of mistake.[4]  Therefore, the award is not excessive and should stand.[5]

### c.  Proceeding Influenced by Bias or Prejudice

Finally, the defendant argues that some of Sheila Lively's testimony violated this Court's prior ruling as well as the Federal Rules of Evidence.  The defendant claims that the testimony "contained inadmissible hearsay, was unduly emotional, spoke to causation, and inflamed the jury."  [Doc. 173 at PageID # 1416].

It is presumed that the jury follows the district court's instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000); *see also Arban v. West Publ'g Corp.*, 345 F.3d 390, 405 (6th Cir. 2003). This Court's limiting instruction sufficiently guarded against the defendant's hearsay concerns. Further, Sheila Lively's testimony on the plaintiff's emotional state at the time of the events was properly admitted and did not violate this Court's prior ruling.

After review of the transcript, Ms. Lively's testimony was confined to describing the emotional state of the plaintiff at the time the harassing events were taking place.  The questions directed to the witness were properly limited to topics regarding Ms. Lively's personal knowledge of the plaintiff's emotional state during the time of the events.  As this Court previously ruled, this testimony is proper.  Indeed, not only did the defendant fail to object to this Court's pretrial ruling, but when it did contemporaneously object at trial, it conceded that testimony from Sheila lively

---

[4] *See infra* Part II.A.2.c.
[5]  It is worth mentioning that even if this Court were inclined to reduce the jury's award for emotional pain and mental anguish or to completely disregard the award entirely, the substantial punitive damage award would ultimately "fill back in" the total amount the plaintiff is entitled to pursuant to the statutory cap.

about "how she observed [the plaintiff's] feelings" at the time would be admissible. This Court's limiting instruction near the beginning of the witness's testimony further shielded against any improper understandings the jury may have reached regarding causation. Indeed, this Court clearly instructed the jury that "to the extent that this witness testifies about something her daughter told her that somebody else said, that evidence is being offered by the plaintiff only to shed light on the state of mind of the plaintiff at that time. You are not to consider the statements for the truth of the matters asserted." [Doc. 182 at PageID # 1727].

Additionally, assuming *arguendo* that the mother's testimony did venture into the realm of causation, the overwhelming weight of the evidence presented at trial would have produced the same outcome.[6] Further, this Court declines to hold Ms. Lively's testimony as unduly emotional, nor does it find that her testimony prejudicially inflamed the jury causing them to reach an erroneous verdict. Even without the mother's testimony, the weight of the evidence presented at trial would have supported the jury's verdict.

For the foregoing reasons, the defendant's motion for a new trial is **DENIED**.

## B. Remittitur

### 1. Legal Standard

Title VII of the Civil Rights Act places a limitation on the amount of damages that may be awarded in an unlawful intentional discrimination case. *See* 42 U.S.C. § 1981a(a)(1) and (b)(3). The cap on nonpecuniary damages is dependent on the number of employees of the defendant. The statute requires that the sum of the amount of compensatory damages for emotional pain and suffering, mental anguish, and other nonpecuniary losses, and the amount of punitive damages must be limited to $200,000 for defendants who employ more than 200 and fewer than 501

---

[6] *See supra* Part II.A.2.a.

employees, and $300,000 for defendants who employ more than 500 employees. *See* 42 U.S.C. § 1981a(b)(3). Neither party has addressed who has the burden of proof for the number of employees employed by the defendant, and this Court has been unable to find Sixth Circuit precedent on the issue. Review of the case law suggests that many courts place the burden on the defendant. *See, e.g.*, *Mendez v. Perla Dental*, No. 04 C 4159, 2008 WL 821882, at *3-4 (N.D. Ill. March 26, 2008) (finding "that defendants bear the burden of proof in establishing the number of employees [] during the relevant time period"); *Dominic v. DeVilbiss Air Power Co.*, No. Civ. 05-5016, 2006 WL 516847, at *4 (W.D. Ark. March 2, 2006) (explaining that "it is the defendant (and not the plaintiff) who has the burden of establishing the number of defendant's employees").

The appropriate time period for determining the number of employees an employer has for purposes of the statutory damages cap is the calendar year in which the complaining party worked or the year preceding that one. *See* 42 U.S.C. § 1981a(b)(3).

**2. Analysis**

Both parties agree that the award should be remitted; the only dispute concerns the number of employees of the defendant for purposes of determining the ultimate remittance. The defendant contends that SCI Tennessee Funeral Services, LLC employs 427, thus the statute requires a reduction of the combined award of compensatory and punitive damages to $200,000. Along with their post-trial motion, the defendant attached a "Declaration of Michael Tabers," which references a list of all SCI Tennessee Funeral Services, LLC employees. [Doc. 173-1]. This list, however, does not include Andrea Herring, nor does it include the names of the managers who testified at trial, Vicky Bryant and Susie Mozolic, calling into question its accuracy. The defendant contends that this list is "the best evidence presented as to the number of Defendant's employees . . . ." [Doc. 186 at PageID #2044].

The plaintiff responds to the defendant's argument by pointing to the proof actually presented at trial. Indeed, at trial, the plaintiff testified that SCI employs more than 500 individuals. Further, much of the evidence produced throughout the trial referred to the parent company SCI, Inc. Neither of the defendant's live witnesses—Charles Gibson, human resource manager and John Fredrickson, market director and corporate representative—were based in Tennessee; both were based in North Carolina. Fredrickson and Gibson were intimately involved in the investigation of the plaintiff's sexual harassment and retaliation complaints, and both testified that they worked for the larger parent company SCI, Inc. Many of the admitted exhibits produced at trial, including the plaintiff's attendance records, performance evaluations, and employee handbook were SCI, Inc. documents. The employee handbook outlined the company's policies regarding sexual harassment and retaliation; Charles Gibson testified that those were the policies which applied and were in effect at the time of the events giving rise to this lawsuit. It also appears that SCI, Inc. readily transfers its employees among its state subsidiaries, as shown by plaintiff's own transfer from Nevada where she first worked for SCI to Tennessee.

The defendant repeatedly places great emphasis on the plaintiff's failure to utilize the Care Line as evidence that she "unreasonably failed to take advantage of any preventative or corrective opportunities that SCI provided." [Doc. 173 at PageID # 1414]. Throughout the trial and in closing arguments, defense counsel drew great attention to the plaintiff's failure in utilizing the Care Line to show that she acted unreasonably. Charles Gibson testified that calls to this Care Line are received through the SCI, Inc. corporate office. The defendant's argument that the plaintiff did not utilize this Care Line is completely at odds with their assertion that SCI, Inc. and SCI Tennessee Funeral Services, LLC are distinct companies for purposes of counting employees. The Court struggles to see how failing to take advantage of a different company's preventative

13

opportunities for reporting sexual harassment could be "unreasonable." Instead, the defendant's argument regarding the offered Care Line completely undermines their argument that SCI, Tennessee Funeral Services should be considered distinct from SCI, Inc.

During the punitive damages phase of the trial, the plaintiff entered reports and exhibits regarding SCI, Inc.'s revenue and profits. The defendant initially objected to these documents, but later withdrew its objection before presentation to the jury. The jury considered SCI, Inc.'s revenue and financial market in making their ultimate punitive damages determination.

The Court finds that the parent company, SCI, Inc., shall be used for purposes of counting employees for the damages cap for this case. Although there is currently no clear guidance from this Circuit on this issue, a number of factors suggest that this determination is proper in these circumstances.

First and foremost, the Court agrees with the plaintiff that the evidence presented at trial is the most appropriate evidence on this issue. The defendant has provided no legal authority showing that this Court may even consider additional information provided by an unidentified individual's affidavit offered post-trial. Furthermore, even if the Court may consider this evidence, the proof entered at trial under oath and subject to the Federal Rules of Evidence carries significantly more weight than any other evidence offered by either party.

Secondly, in viewing the proof of this trial, the particular circumstances of this case suggest that the Court's finding is most appropriate here. SCI, Inc., the parent company, was intimately involved with SCI Tennessee Funeral Services, LLC's personnel matters, including the particular occurrences giving rise to this lawsuit. The plaintiff first made her complaints to Vicky Bryant, and after the sexual harassment did not stop, the plaintiff informed John Fredrickson, the market manager for the region. John Fredrickson contacted SCI, Inc. human resource representative

Charles Gibson to interview and handle the plaintiff's sexual harassment complaints. The policies and procedures for handling sexual harassment and retaliation in the workplace came directly from the SCI, Inc. employee handbook, which was entered as evidence. Indeed, these policies were central to the issues in this case. Much of the evidence at trial, including pay stubs, attendance records, and performance evaluations were SCI, Inc. documents. The Care Line, which the defendant so rigorously argues was necessary for the plaintiff to take advantage of, was an SCI, Inc. avenue for reporting sexual harassment. The individuals who made the ultimate decision approving the plaintiff's termination—John Fredrickson and Charles Gibson—were SCI, Inc. employees. Further, the Equal Employment Opportunity Commission position statement entered as evidence was sent from SCI, Inc.'s corporate office and was authored by its Senior Corporate Counsel. The 10-K admitted for the jury's consideration of punitive damages was prepared by the parent company SCI, Inc. This form indicated that SCI, Inc. owns a vast network of funeral service locations and cemeteries across the nation and, as of December 31, 2016, employed 15,361 individuals on a full-time basis and 8,102 on a part-time basis. All of this proof entered as evidence at trial, as well as other facts not mentioned here, clearly show that SCI, Inc. is the employer for purposes of applying the statutory damages cap here.

Finally, the post-trial evidence offered by the defendant carries little weight in this Court's view. The declaration offered by the defendant states that SCI Tennessee Funeral Services, LLC has 427 employees. It lists all of the employees in the attached exhibit. However, the attached exhibit does not include Susie Mozolic, Vicky Bryant, or the plaintiff. There is no question that these individuals would be included on the list of employees for the calendar year in which the complaining party worked or the preceding year. *See* 42 U.S.C. § 1981a. Thus, even if the Court

were to consider this list, it would provide little, if any, substantive value on this issue because it is inherently lacking information for the relevant time period.

### 3. Application of Damages Cap

Based on the foregoing, the Court will look to SCI, Inc. for purposes of counting the number of employees for applying the statutory damages cap. The only evidence during trial this Court has found regarding the size of SCI, Inc. for the relevant time was plaintiff's direct testimony that the company employed more than 500 individuals.[7] The defendant has produced ***no*** evidence regarding the size of the company *during the relevant time period*. There are no dates verifying the time period that the defendant's post-trial offered list includes, and in fact, the declaration of Michael Tabers is not even dated. Regarding the size of SCI, Inc., during the relevant time period, the plaintiff's testimony is substantively unrebutted. Thus, the Court finds that SCI, Inc. employed more than 500 individuals for purposes of calculating the statutory damages cap.

In a case where the employer has more than 500 employees, $300,000 is the maximum amount of compensatory damages that may be awarded for the sum of emotional pain, mental anguish, and punitive damages. *See* 42 U.S.C. § 1981a(b)(3)(D). Back pay and interest on back pay are both excluded from the damages cap. 42 U.S.C. § 1981a(b)(2). The jury awarded $200,000 for emotional pain and mental anguish, and $1,750,000 for punitive damages. As discussed above, this Court has found that the award for emotional pain and mental anguish is not excessive. *See supra* Part II.A.2.b. Therefore, the $200,000 award shall stand, and the punitive damages award shall be remitted to $100,000 to satisfy the statutory cap. The computation is as follows:

---

[7] The 10-K admitted for the punitive damages phase was for the 2016 calendar year.

| | |
|---|---|
| Amount for Back Pay: | $100,000 |
| Amount for Emotional Pain, Mental Anguish, and Punitive Damages: | $300,000 |
| | |
| Total Damages Award: | **$400,000** |

It is hereby **ORDERED** that the judgment shall be amended to reflect the properly calculated damages awarded in this case with the application of the statutory cap, as set out above.

### C. Reinstatement

"Plaintiffs who prove discrimination in violation of Title VII are entitled to reinstatement, unless exceptional circumstances make the chances for a satisfactory employment relationship unlikely." *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996) (citing *Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985)); *see also Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 753 (6th Cir. 1985) (stating "[a] finding of intentional discrimination presumptively entitles the plaintiff to reinstatement"). Reinstatement is nevertheless "an equitable remedy which is not appropriate in every case." *Fleming v. Ayers & Assocs.*, 948 F.2d 993, 998 (6th Cir. 1991). However, "[f]ederal courts have greatly limited the grounds on which reinstatement may be denied. It is not sufficient that reinstatement might have disturbing consequences, that it might revive old antagonisms, or that it could breed difficult working conditions. Relief is not restricted to that which will be pleasing and free of irritation." *In re Lewis*, 845 F.2d 624, 630 (6th Cir. 1988) (citations and internal quotation marks omitted). Circumstances which courts have found reinstatement to be inappropriate include instances where the plaintiff has found other work, where reinstatement would require displacement of a non-culpable employee, where hostility would result, *Henry v. Lennox Indus.*, 768 F.2d 746, 742-43

(6th Cir. 1985), where the victim of discrimination is not capable of performing the job anymore, *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996), and where the plaintiff would have resigned from working with or without unlawful discrimination, *Fleming*, 948 F.2d at 998 & n.3. "The overarching goal in fashioning relief is to place the injured party, as nearly as possible, in the position they would have occupied absent the illegal discrimination." *Id.*

In the present case, the Court decided to submit the front pay issue to the jury and "if there is an award of front pay, then [the Court] can take up the issue of whether or not the award of front pay is appropriate or whether reinstatement would be."[8] [Doc. 183 at PageID # 1932-33]. The jury returned an award of $0 for front pay. Although acknowledging that reinstatement should be granted in the ordinary case, the defendant now argues that the plaintiff is not entitled to reinstatement for two reasons: (1) because she chose to submit her preferred remedy, front pay, to the jury and is now precluded from seeking reinstatement; and (2) even if not precluded, she is now employed as a Certified Nursing Assistant and is not entitled to change jobs. *See* [Doc. 168]. At trial, the plaintiff suggested that reinstatement would not be feasible given the testimony from the defense witnesses, but has since changed her position, arguing in her brief that reinstatement as a Family Service Counselor in the Chattanooga area—rather than the Tri-Cities area—is warranted because no extraordinary circumstances exist which would preclude reinstatement. *See* [Doc. 165].

### 1. Preclusion

The defendant's first argument seemingly appears to follow this logic: because the jury was instructed on the issue of front-pay and the jury determined that the plaintiff was not entitled to any award of front pay, this factual determination necessarily precludes the plaintiff from being

---

[8] Clearly the Court could have been more articulate in its statement.

awarded reinstatement. However, this Court made very clear that the ultimate determination on the front-pay issue would be taken up, "if there is an award of front pay." [Doc. 183 at PageID # 1932-33]. Therefore, even if an award for front pay was returned by the jury, it would still be this Court's task to determine whether the front pay award was appropriate. Indeed, this Court may have found that even though the jury had returned an award, the plaintiff would not be entitled to it because reinstatement was the appropriate remedy. The Sixth Circuit has made clear that the "determination of the amount of an award of front pay is a jury question," while the "determination of the propriety of an award of front pay is a matter for the court." *Roush v. KFC Nat. Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (citations and internal quotation marks omitted).

Further, the case law cited by the defendant undermines its own logic. *In re Lewis*, cited by the defendant, considered whether "[a] district court was bound by the jury's factual finding of discrimination when deciding [the plaintiff's] equitable claim for reinstatement." *In re Lewis*, 845 F.2d 624, 628 (6th Cir. 1988). There, the plaintiff brought suit against the defendant for illegal discrimination on the basis of her race, in violation of Michigan's Elliott-Larsen Act, Mich. Comp. Laws Ann. § 37.2202(1)(a) (West 1985), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. At trial, the jury found in favor of the plaintiff on her Michigan Elliott-Larsen Act claim. *Id*. at 626. The defendant filed post-trial motions similar to the present case, including motions for judgment notwithstanding the verdict, new trial, and remittitur. *Id*. The district court denied the motions, and further made separate findings of fact as to the plaintiff's Title VII claim, ultimately disagreeing with the jury and finding no discrimination. *Id*. Afterwards, based on its own findings and applying Michigan state law—providing that a court sitting in equity is not bound by the findings of the jury—the district court denied the plaintiff's motion for reinstatement, concluding that racial discrimination had "not been conclusively shown." *Id*.

The Sixth Circuit held that "a judge deciding an equitable issue is bound by the jury's factual findings on an adjoining legal claim." *In re Lewis*, 845 F.2d at 629. Applying this holding to the case, the appellate court reasoned that "[t]he district court therefore should have been guided by the jury's finding of discrimination and granted reinstatement. Once discrimination is found, reinstatement should be granted absent exceptional circumstances." *Id.* at 630 (citing *Allen v. Autauga Cnty. Bd. of Educ.*, 685 F.2d 1302, 1305 (11th Cir. 1982)). This holding was based on the principle that "[i]t is well-settled that the court may not make findings contrary to or inconsistent with the jury's resolution . . . of that same issue as implicitly reflected in its general verdict." *Id.* (alterations in original) (citations and internal quotation marks omitted). For purposes of reinstatement, the issue is whether the jury makes a factual finding of discrimination, not whether they return an award of front pay.

The same rationale applies here. Contrary to the defendant's argument, this Court's focus is not guided by the jury's finding on front pay; rather, when considering reinstatement, the jury's factual determination that discrimination has occurred is "*binding on a court*." *Id.* (emphasis added). Thus, the jury's factual findings in this case do not preclude the plaintiff from reinstatement; its findings *require* this Court to order reinstatement, absent exceptional circumstances.

### 2. Exceptional Circumstances

The defendant's second argument regarding reinstatement most closely resembles exceptional circumstances. The defendant brings two points: (1) a job in Chattanooga is not substantially equivalent to her former position; and (2) she has found other work such that reinstatement is now not necessary nor required.

The Court finds the defendant's first point unpersuasive. Indeed, as clearly outlined above, reinstatement is an equitable remedy, and the Court has "broad discretionary powers to fashion the relief which will best achieve [the] 'make whole' objective." *Fleming v. Ayers & Assocs.*, 948 F.2d 993, 998 (6th Cir. 1991); *see also Ford v. Nicks*, 866 F.2d 865, 875 (6th Cir. 1989) (stating that, where discrimination is present and reinstatement is appropriate, a district court has "broad discretion to fashion relief that would make [the plaintiff] whole"). An order reinstating the plaintiff to her former position in the Chattanooga area is not unreasonable or substantially different than her previous position, especially considering her own testimony that she was required to move away from the Tri-Cities area because of the defendant's actions. Thus, this Court's power to tailor an order for reinstatement to the particular circumstances of this case undercuts defendant's first point. The defendant provides no authority that reinstatement to her former position as a Family Service Counselor at a different location would qualify as an exceptional circumstance making reinstatement inappropriate. SCI is a large corporation with numerous funeral facilities across the nation. The co-worker responsible for the sexual harassment does not work in the Chattanooga area, and it would create additional hardship on the plaintiff to move back to the Tri-Cities area after relocating in search of a job. Further, the defendant has not provided any reason why reinstatement in the Chattanooga area would be any more burdensome than reinstatement in the Tri-Cities area.

Regarding the defendant's second point, the Sixth Circuit has said that reinstatement *may* be inappropriate where the plaintiff has found other work. *See Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 753 (6th Cir. 1985) (citing *Brito v. Zia Co.*, 478 F.2d 1200, 1204 (10th Cir. 1973)). However, the plaintiff's employment at another job does not require a finding that reinstatement is inappropriate. *See Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1235 (6th Cir.

1996) (remanding case to district court for determination of whether reinstatement was the appropriate remedy for employee who secured alternative employment after discharge that was "not equivalent to the position from which she had been [wrongfully] discharged").

Consideration of the overarching goal to put the aggrieved party back into the position they would have been absent the wrongful acts provides substantial ammunition against the defendant's second point. During trial, the plaintiff went into great detail regarding her career goals and aspirations to work and retire in the funeral industry. She has been unable to find a job within her chosen field since her termination. She further testified that she has been unable to secure employment with a salary comparable to what she enjoyed at SCI. Indeed, she testified that, while working at SCI, her pay range was $45,000 to $60,000 per year. She has not earned more than $26,000 per year at any job since her termination. This testimony was largely unrebutted at trial. From a financial perspective, there is little question that the other work she has found is not equivalent to the position she held before the defendant's wrongful acts. The substantially lower salary, coupled with her ambitions and long-term aspirations to work in the funeral industry, does not support a finding that her current work constitutes an "exceptional circumstance" to render reinstatement inappropriate.

Based on the above, the Court finds there are no exceptional circumstances which render reinstatement to her former position inappropriate. Therefore, the plaintiff is entitled to reinstatement, and said remedy is appropriate in this case.

## III.    CONCLUSION

For the foregoing reasons, the defendant's motion for a new trial is **DENIED**. Further, the defendant's motion for remittitur of damages is **GRANTED IN PART** and **DENIED IN PART**. As discussed above, the request to remit the jury's verdict is **GRANTED**, and the total remitted

verdict shall be an award of $400,000 in favor of the plaintiff.  To the extent the defendant has requested a remittitur inconsistent with this determination, such request is **DENIED**.  Further, the plaintiff is entitled to reinstatement, and said remedy is appropriate.  A separate order shall enter outlining this Court's instructions for reinstatement.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE